## JAMES H. WALL & another *vs.* WARNER HINDS.

An assignment of a lease by the lessee, and acceptance of rent from the assignee by the lessor, do not discharge the lessee from liability on his covenants, for rent and taxes subsequently accruing.

Under a lease which provides that the lessor may terminate it by three months' notice in writing " to the lessee," and that, upon receiving such notice, " the lessee, his legal representatives or assigns," by giving written notice to the lessor, may continue to hold the premises at an increased rent, which the lessee, in that contingency, covenants to pay, a notice in writing to the lessor from assignees of the lessee, stating their receipt of such a notice from him, and their intention to hold the premises for the residue of the term at the increased rent, is admissible in evidence against the original lessee in an action upon his covenant for the increased rent.

Partial injury of a building by fire, so as to render part of it uninhabitable until repaired, does not authorize the lessee to terminate a lease thereof which provides " that, if the premises shall be destroyed by fire, the payment of rent and the relation of landlord and tenant shall cease at the election of either party."

Tenants in common may maintain a joint action for the rent due under a sealed lease of the joint estate, all the covenants in which are with them jointly, although by an agreement annexed to the lease, and made part thereof, it is stipulated that half of the rent shall be paid to each.

A lessee's covenant to pay taxes, in a lease of part of an estate, binds him to pay a proportional part of the taxes assessed on the entire estate, although the lessor never re quested the assessors to assess separately the part leased.

A cistern and sinks, though fastened by nails, or set into the floor by cutting away the boards, and water pipes, fastened to the walls by hooks, and passing through holes cut for the purpose in the floors and partitions, if put by the lessee into a building leased for a hotel and boarding-house, may be removed by him during the term.

So of gas pipes passing from the cellar through the floors and partitions, and kept in place in the rooms by metal bands, though some of them pass through wooden ornaments of the ceiling, which are cut away for their removal.

For an unauthorized removal of fixtures, put in by a lessee under a special agreement in writing as to his right to remove them, and the lessor's right to purchase them, the lessor's remedy is by action on the agreement, and not on the covenant against waste in the lease.

ACTION OF CONTRACT upon the covenants for the payment of rent, for the payment of taxes, and against waste, contained in the following indenture of lease :

" This indenture, made this tenth day of September iι the year eighteen hundred and forty four, by and between James H. Wall and Edward H. Hemenway, both of Worcester in the county of Worcester, traders, of the one part, and Warner Hinds, of the same Worcester, innholder, of the other part, witnesseth, that the said Wall and Hemenway, of the one part, do hereby lease, demise and let unto the said Hinds, his executors, administrators and assigns, all that tavern estate and boarding-house, situated on the west side of Main Street, and between Elm and Maple Streets, in said Worcester, and bounded on the east by the new range of stores recently erected by said Wall and Hemenway, so far as the same extend, and otherwise by said Main Street; on the south by said Elm Street ; on the west by land of Calvin Foster; and on the north by Maple Street ; together with all the rights, privileges and appurtenances to the same belonging.

" To have and to hold the same to him the said Hinds, his executors, administrators and assigns, for the term of nine° and an half years from the first day of October next ; provided, however, that the said lessors or their legal representatives may terminate this lease at the expiration of five years from the said first day of October, by giving to the said lessee three months' notice in writing of their intention so to do, and taking, at the appraisal of three judicious, disinterested men, one to be chosen by each of said parties, and the other by the two that may be so selected, all the furniture of the lessee belonging to the establishment, and tendering him payment therefor, accordingly. If, however, upon receiving such notice, the said Hinds, his legal representatives or assigns, shall, within thirty days therefrom, give notice in writing to the said lessors or their legal representatives, that he or they will continue to hold the demised premises for the residue of said term, at the rate of fifteen hundred dollars per annum, he or they shall have the right so to hold them, notwithstanding such notice given them by the lessors or their legal representatives as aforesaid.

22 *

" And the said lessee does, for himself and his legal representatives, covenant with the said lessors that he will well and truly pay the rent of thirteen hundred dollars a year, in quarterly payments of three hundred and twenty five dollars ; and should said rent be enhanced to fifteen hundred dollars a year upon the contingency before expressed, he shall then pay that sum in like quarterly payments of three hundred and seventy five dollars for and during the residue of said term ; provided always, that if the premises should be destroyed by fire or other casualty, then the payment of rent and the relation of landlord and tenant shall wholly cease, at the election of either party. And at the end of the term the lessee, or his legal representatives, shall quit and deliver up the premises to the lessors or whomsoever shall be entitled to the possession of the same, in as good order and condition as the same now are or may be put into by the lessors, reasonable use and wearing thereof, and accidents by fire and other injuries not happening through the fault of the lessee, excepted. And the said lessee does further covenant that he will pay all taxes levied or to be levied on the premises during said term, and for such further time as the said lessee shall hold the same ; and not make or suffer any waste thereof, underlet, or make alterations to the injury of the freehold, without the consent of the lessors ; and that they may enter to view and make improvements, and expel the lessee if he shall fail to pay the rent as aforesaid, or make or suffer any strip or waste of the premises ; and that the same shall be occupied and upheld as a tavern and boarding-house during said term. In witness whereof the said parties have hereunto set their hands and seals the day and year first above written. James H. Wall, [Seal.]

Signed, sealed and delivered ⎫ E. H. Hemenway, [Seal.]
in presence of Ira M. Barton. ⎭ Warner Hinds, [Seal.]

" Memorandum. It is further agreed that the rent shall be paid on the demised premises, the one half to said Wall and the other half to said Hemenway, and this memorandum is hereby made a part of the foregoing indenture James H. Wall,
Witness, Ira M. Barton. E. H. Hemenway
Warner Hinds.

" Worcester, ss. Sept. 10, 1844. Then personally appeared J. H. W. above named, and acknowledged the foregoing instruments to be his free act and deed.

" Before me, Ira M. Barton, Jus. Peace."

After the commencement of the trial, and the introduction of evidence on both sides, the case was taken from the jury by consent of parties, and submitted to the decision of the court, upon the following case stated :

Under the covenant for the payment of rent, the plaintiffs claimed rent for the quarter ending October 1st 1853, at the rate of $1,500 a year. It appeared that the defendant assigned the lease on the 17th of May 1845 to Wood & Fisher, from whom, through sundry mesne assignments, the interest of the lessee vested in William A. Richardson on the 24th of March 1852 ; and that the plaintiffs had received rents of such assignees. The defendant contended that the effect of such assignments and receipt of rent from the assignees was to release the defendant.

In support of their claim for rent at the rate of $1,500 yearly, the plaintiffs gave no evidence of any notice from them to terminate the lease, and take the furniture, as therein provided, other than a written notice delivered to the plaintiffs on the 18th of July 1849, signed by Weld & Harrington, who were then the assignees of the lease, stating that they had received such a notice from the plaintiffs, and informing the plaintiffs that, availing themselves of the provisions of the lease, they should continue to hold the premises for the residue of the term at the rate of $1,500 a year. And the plaintiffs contended, and the defendant denied, that this paper furnished evidence of a giving of such a notice by the plaintiffs, or of a waiver thereof, which would entitle them to recover the increased rent.

The defendant contended that the lease was determined in consequence of the destruction of the buildings by fire on the 4th of September 1853, and the election of the tenant to terminate the lease on the 1st of October 1853, as indicated by the following facts : The building was occupied as a tavern and boarding-house, pursuant to the lease, and contained more than

one hundred lodging rooms, twenty of which were occupied by permanent boarders. The fire originated in the attic, the whole inside of which was charred, and a hole about six feet square burned in the roof; a cistern in the attic, from which the house was supplied with water, was so injured as to render it temporarily useless; and a portion of the ceiling of two of the rooms in the next story burned. A large quantity of water was thrown upon the building at the time of the fire, which rendered seven of the rooms temporarily uninhabitable, and saturated the ceiling and walls of nearly all the main part of the house, so that there was a general dampness in that part of it for some weeks; and the plastering on the lower and main entry fell off in five or six places; and about ten days after the fire, a large piece of the plastering, weighing about six hundred pounds, suddenly fell, which a guest, then passing, narrowly escaped. In the course of a week after the fire, the plaintiffs caused the holes in the roof to be stopped up, but did not do it effectually, so that one rainy night the tenant was obliged to change the beds in some of the rooms after the guests had retired, and a stream of water ran down stairs, and left more than a hogshead on the lower floor in the entry. The plaintiffs received $1,428 of the insurance company by whom they were insured, for the damage done to the building at the time of the fire. All guests who offered themselves were entertained until the 23d of September, when Richardson, the tenant, gave written notice to the plaintiffs that in consequence of the injury done to the house by the fire, and of the plaintiffs' neglect to put it in condition for occupation, he considered the lease as at an end, and should vacate the premises on the 1st of October, and not pay any rent since the fire. On the 24th of September, the tenant entertained a military company there, as he had agreed a week before to do. All but one of the permanent boarders, most of whom occupied rooms in that part of the house which was injured by the fire and water, left the house immediately after the fire; but a few of them did not leave in consequence of the fire, and several returned. Richardson testified that he considered the lease as terminated by the fire; and another witness testified

that he heard Wall say, the day after the fire, that he had seen the house, and supposed the lease was terminated by the fire, and that he (the witness) soon after communicated this statement to Richardson. Richardson also testified that he continued to occupy the premises after the fire, in the expectation of obtaining a new lease; and that, if he could have got a new lease at the expiration of the old one, he could have got along, without discontinuing business, by making repairs a little at a time; but that it would have taken a month to put the premises in complete repair. There was also evidence that, eight or ten days after the fire, negotiations for a new lease were commenced with the plaintiffs in behalf and at the request of the tenant, and were broken off on the 17th of September; but it did not appear that the plaintiffs were informed that the tenant expected such new lease to take effect before the 1st of April 1854, when the old lease would expire by its own limitation.

The defendant further contended that this action could not be maintained in the name of the plaintiffs jointly; because the lease provided that the portion of rent due to each should be paid to him.

Under the covenant for the payment of taxes, the plaintiffs claimed $197.50, for taxes on the demised premises for 1853. It appeared that at the time of the execution of the lease, and ever since, the assessors of the city of Worcester had taxed the plaintiffs by one valuation for the " Worcester House estate," which included the demised premises, and also a block of stores mentioned in the lease, and occupied by other tenants of the plaintiffs. Until the year 1853, the taxes on the whole estate were paid by the plaintiffs, and two thirds thereof repaid to them, as the proportion belonging to the demised premises, by the then tenants, but without the knowledge of the defendant. In 1853, said Worcester House estate was taxed the sum of $315, which the plaintiffs paid, and no part of which was repaid to them before the commencement of this action, although the plaintiffs, after paying such tax, made a demand in writing upon the defendant, informing of the whole amount taxed to the Worcester House estate, and demanding " the sum of $197.50,

or whatever might be his proportion thereof." It was agreed to be true, if competent to be proved, that the demised premises were two thirds in taxable value of the whole estate.

The alleged breaches of the covenant against waste consisted in the removal of a cistern, sinks and water pipes, gas pipes and marble tiles, on the 25th of September 1853, with the knowledge of the defendant.

The cistern, water pipes and sinks were put into the house at an expense of about $500, by Wood, an assignee of the defendant, during the term. The cistern was of wood, lined with lead, and rested upon the floor of the attic, and was filled with water by a supply pipe, which passed from the city aqueduct into the cellar of the building, and up through the floors of the other stories, to the cistern. The pipes, which conducted the water to sinks in various parts of the building, terminated with faucets affixed by metal tacks to boards nailed to the walls, and were fastened by hooks driven into the plastering and walls, and passed through holes, which were cut for the purpose in the flooring and partitions, when the pipes were put in, and were not filled up when they were taken away. One of the sinks was of marble, and four of wood, three of which were fastened to the floors by nails, and one set into the floor by cutting away the boards. Pipes carrying away the waste water from the sinks passed down through the floors. The plastering was somewhat rent by removing the fastenings of the pipes.

The gas pipes also were placed in the house by an assignee of the defendant during the term. They passed from the street into the cellar, and thence up through the floor, and branched into the various rooms, passing along inside of the partitions, and through holes cut in the partitions for the purpose, and were kept in place by bands or hoops of metal fastened to the walls. In a few of the rooms the pipes passed through ornamental centre pieces of wood, attached to the ceiling, which were cut through for their removal.

The tiles were of marble, about fourteen inches square each, and between an inch and an inch and three quarters in thickness, with polished surface, and covered the floor of the entries,

office and wash room in the lower story of the house, being an area of more than a thousand square feet, and were laid in cement over the floor previously used.   They were laid by the defendant, pursuant to a sealed agreement executed by him and the plaintiffs on the 29th of November 1844, by which the defendant, in consideration that the plaintiffs would permit him to put down tile or flagging as therein mentioned, agreed " to furnish and put down in lime, mortar or cement, in a good and workmanlike manner, and at his own expense, good handsome marble tile or flagging on the space or entry ways in the front part of the Worcester House," as particularly defined, " either upon the floor as now laid, or upon the under floor, as he shall think best ; " and to " prop up and support the flooring timbers so as to prevent their settling by the weight of said tile or flagging," and " that, at the expiration of the said lease, he will take up and remove said tile or flagging at his own expense, and clean the mortar or cement from the flooring, and leave it in good order for laying a floor of boards," unless the plaintiffs should, on or before the expiration of said lease, elect to have said tile and flagging remain, as laid by the defendant, in which case they should pay him the sum of $200, and he should convey said tile or flagging to them or their assigns.   Two days before the removal of the tiles, the tenant offered them to the plaintiffs for the price of $200, if he would accept them before the next night, but received no decided answer.   The tiles were recovered by means of a crowbar and shovel, leaving the hardened cement adhering to the floor; and many of them were broken by the removal.

*C. Allen & G. F. Hoar*, for the plaintiffs.   1. The assignment of the lease and the acceptance of rent from the assignee did not discharge the defendant from liability on his covenants. *Fletcher* v. *M'Farlane*, 12 Mass. 43.   *Thursby* v. *Plant*, 1 Saund. 241 & *note.   Dean, &c. of Windsor* v. *Gover*, 2 Saund. 302 & *note.   Auriol* v. *Mills*, 4 T. R. 94.   Grady on Fixtures, 318–320. Taylor Landl. & Ten. (2d ed.) §§ 371, 384.   1 Chit. Pl. (6th Amer. ed.) 136.

2. The assignment of all the defendants' interest gave the

assignee the right to waive the condition on which the increased rent was payable, and made his acknowledgment that such condition had been performed competent evidence against his assignor.   1 Greenl. Ev. §§ 179, 180.

3. The evidence proved no such destruction of the property as is contemplated by the lease, in order to entitle either party to terminate it.   Co. Lit. 53 *a.*  Grady on Fixtures, 274.  1 Cruise Dig. tit. 3, *c.* 2, § 23.   Bro. Ab. Condicions, pl. 40.  2 Rol. Ab. 818. That the parties had in mind the distinction between destruction and mere partial injury, appears from the next covenant, as to the condition of the premises at the end of the lease.   It appears that the injury was not such as to put an end to the business for which the house was leased.   And the continued occupation of the tenant was of itself a waiver of any right to terminate the lease.

4. The legal interest in the covenant for the payment of rent was joint, and a joint action thereon may properly be maintained.   1 Chit. Pl. 4.   *Anderson* v. *Martindale,* 1 East, 497. *Rolls* v. *Yate,* Yelv. (Amer. ed.)  177, *& note.   Eccleston* v. *Clipsham,* 1 Saund. 153.   *Slingsby's case,* 5 Co. 18 *b.   Montague* v. *Smith,* 13 Mass. 405.  The original indenture is made with the plaintiffs as one party; the grant is of their joint estate; and all its covenants are with them jointly.   The memorandum, which is expressly made part of the lease, and so treated in the acknowledgment, merely points out to whom the payment shall be made.

5. The action may be maintained for that proportion of the tax upon the whole Worcester House estate, which belonged to the demised premises; especially as the tenant never before made any objection to the mode of assessment, nor took any steps to induce a separate assessment   *Boston Water Power Co.* v. *Boston,* 9 Met. 203, 204.   Taylor Landl. & Ten. §§ 383–385, and cases cited.

6. The gas pipes and water pipes, with the cistern and sinks, were part of the realty, and not removable by the tenant; for they could not be removed without injuring the freehold, and becoming themselves of comparatively small value; they were

not erections for the purposes of trade, but for the improvement of the building, and, so long as the building continued to be used as a human habitation, would remain an important, if not a necessary, part of the house ; they would not be suitable for a smaller building; and the circumstances and mode of their annexation did not indicate an intention to remove them. 2 Kent Com. (6th ed.) 343, 344. Gibbons on Fixtures, 34. Grady on Fixtures, 153, 154, and cases cited. Amos & Ferard on Fixtures, (2d Amer. ed.) 91, 92, 93. Co. Lit. 53 *a. Poole's case*, 1 Salk. 368. *Nicholas* v. *Chamberlain*, Cro. Jac. 121. *Kinlyside* v. *Thornton*, 2 W. Bl. 1111. *Buckland* v. *Butterfield*, 2 Brod. & Bing. 54.

7. For similar reasons, the tiles were not removable as fixtures. Chit. Con. (8th Amer. ed.) 323. Grady on Fixtures, 96, 97. *Poole's case*, 1 Salk. 368. *Naylor* v. *Collinge*, 1 Taunt. 19. *Martyr* v. *Bradley*, 9 Bing. 24. *Penry* v. *Brown*, 2 Stark. R. 403. The only right of removal given to the lessee, by the contract under which the tiles were laid, was to remove the tiles at the expiration of the term, if not purchased by the lessors. To remove them before was waste. As soon as waste is done, the covenant is broken, and an action may be commenced.

*P. C. Bacon & E. B. Stoddard*, for the defendant. 1. The receipt of rent from the assignees of the lease is evidence of a new contract with them, which discharges the defendant.

2. The plaintiffs can, at most, recover no more rent than at the rate of $1200 yearly. The terms of the lease did not authorize the assignees of the lessee, without any notice from the lessors, to give a notice of an intention to retain the premises at an increased rent; and such notice is inadmissible in evidence against the lessee, for any purpose.

3. The fire caused such a destruction of the building, within the meaning of the lease, as to entitle the tenant to determine the lease by giving reasonable notice to the plaintiffs. Taylor Landl. & Ten. §§ 328–331. *Stockwell* v. *Hunter*, 11 Met. 448. The negotiations for a new lease were no continuance of the old one, or waiver of the right to determine it.

4. The plaintiffs cannot maintain a joint action for the rent,

inasmuch as the memorandum on the lease provides that each lessor's share or portion of the rent shall be paid to him. The fact that the other covenants are joint cannot affect this. 1 Chit. Pl. 10, 12. *Withers* v. *Bircham,* 3 B. & C. 254.

5. The taxes for 1853 cannot be recovered, there never having been any taxes assessed upon the demised premises, and the defendant never having consented to a tax on the Worcester House estate, and an apportionment by any one; and it not appearing that the assessors were ever asked to assess the demised premises separately.

6. The cistern, sinks and water pipes, and gas pipes were fixtures, and were rightly removed by the tenant. *Elwes* v. *Maw,* 3 East, 38. *Lawton* v. *Lawton,* 3 Atk. 13. *Foley* v. *Addenbrooke,* 13 M. & W. 174. *Lawrence* v. *Kemp,* 1 Duer, 363. Amos & Ferard on Fixtures, (2d ed.) 21, 27, 46, 47, 69, 266, 267, 270. 1 Parsons on Con. 430, 431. Taylor Landl. & Ten. §§ 544–547.

7. The tiles were fixtures, and were therefore rightly removed. Taylor Landl. & Ten. § 551, and authorities above cited. But if not fixtures, the tenant had a right, under the contract relating to them, to remove them, if the lease was terminated. If the lease was not terminated, the plaintiffs had no rights until the end of the lease, as no material injury was done to the freehold by their removal.

BIGELOW, J. 1. The assignment by the lessee of his entire interest in the estate under the lease, and the acceptance of rent by the plaintiffs from the assignees, do not constitute a valid defence to the present suit. It is the well settled rule of law that in such case the lessor cannot maintain an action of debt for rent against the lessee; but that an action will lie against him on the covenant for the payment of rent. The reason of the rule is, that, although by the assignment the privity of estate between lessor and lessee is terminated, there still remains the privity of contract between them, created by the lease, which is not affected by the assignment. The lessee still continues liable on his covenant, by virtue of the privity of contract *Bachelour* v. *Gage,* Cro. Car. 188. *Barnard* v. *Godscall,* Cro.

Wall & another *v.* Hinds.

Jac. 309. *Thursby* v. *Plant*, 1 Saund. 240. *Auriol* v. *Mills* 4 T. R. 94.

2. The right of the plaintiffs to recover rent at the rate of fifteen hundred dollars a year results necessarily from the express terms of the lease. The power to continue the term at an increased rent, in the contingency contemplated by the original parties to the contract, was given not only to the lessee, but also to " his legal representatives and assigns." The defendant, therefore, by assigning the lease, transferred this right to those who were his legal assigns at the time when it was to be exercised. He was therefore, in this particular, bound by their act. Although he had parted with his entire interest in the estate under the demise, he was still liable to the plaintiffs, by virtue of privity of contract, on his express covenant to pay rent during the residue of the term for which the lease was continued, and at the increased rate.

Nor is it a valid objection to this part of the plaintiffs' claim, that no direct notice is proved to have been given to the defendant of the intention of the plaintiffs to terminate the lease at the expiration of five years from the date of the demise, upon which the right of the lessee and his assigns to continue the term was made to depend. The manifest intent of this clause in the lease was, that the notice to terminate the lease should be given to those who, in that event, had the corresponding right to continue it in force upon the terms prescribed. This had become vested solely in the assignees of the lease. The defendant had then no interest in the demised premises, and no right to exercise the power of extending the lease. He had no control over the matter whatever, and could not, by any act of his, vary or change his own liability on his covenants. A notice, therefore, to him would have been wholly useless. It was properly given to the assignees of the lease, in whom the entire interest in the estate and in the beneficial enjoyment of the covenants of the lessors had become vested by the act of the defendant. And their acknowledgment, that such notice was duly given was competent proof. The rule is general that the admissions of a person who is the legal representative of a party in any

subject matter shall be received against the party.  1 Greenl.
Ev. § 180.

3. The evidence fails to show such a destruction of the prem-
ises as to absolve the defendant from the payment of rent under
the covenants in the lease.  The building was, at most, only
partially injured, and could have been repaired for a sum less
than a single year's rent.  The usual stipulation in leases of
buildings is, that if the premises are injured or destroyed by fire,
the rent, or a proportional part thereof, shall be abated.  But in
the present case it is to be observed that the parties studiously
omitted to provide for the contingency of an injury by fire, and
confined their agreement to the destruction of the premises.  It
would require too great a latitude of construction to hold that
the partial injury to the premises, caused by the fire, as dis-
closed by the evidence, amounted to such a destruction of them
as to terminate the lease by virtue of the stipulations contained
in it.

4. The remaining objection to the recovery of the rent is, that
the action cannot be maintained by the plaintiffs jointly, but
that several actions should have been brought by the plain-
tiffs for a breach of the covenant for its payment.  This objec-
tion is founded on the memorandum annexed to and forming
part of the lease, by which it is agreed that one half of the rent,
which the lessee covenanted to pay to the two lessors jointly,
should be paid to each of them separately.  The general rule is
well settled, that tenants in common may maintain a joint action
to recover rent, when there is an agreement to pay the entire
rent to the lessors.  1 Walford on Parties, 425.  *Wilkinson* v.
*Hall*, 1 Bing. N. C. 713.  *Powis* v. *Smith*, 1 D. & R. 490, and
5 B. & Ald. 850.  In the present case, the original agreement
was to pay rent to the two lessors jointly.  The effect of the
memorandum was not to abrogate that covenant in the lease ;
but only to regulate the mode of payment, and to prescribe the
manner in which the lessee was to fulfil his covenant.  Instead
of performing his agreement, by a payment or tender of the whole
rent to one of the joint lessors, as he might well do in the absence
of a special agreement, he was required to pay a moiety to each.

But this does not make the previous covenant several, so as to change the remedy of the lessors for its breach into separate actions. This construction gives full force and effect to both clauses in the lease concerning the payment of rent, instead of annulling, by implication, the covenant to the plaintiffs jointly, as would be necessary if we adopted the view urged in behalf of the defendant. Besides; it is not to be overlooked that all the other covenants in the lease are made to the plaintiffs jointly; that the demise itself is joint, and the remedy of expelling the lessee, in case of nonpayment of rent, is also joint. It cannot be reasonably supposed that it was the intention of the parties, by the memorandum, to bind the lessors to pursue each a separate remedy for breach of one covenant in a lease, in which all the other covenants were made to them jointly, and for breach of which they could pursue a joint remedy.

5. The defendant is also liable on his covenant for the payment of the taxes assessed on the premises for the year 1853. *Tuckerman* v. *Sleeper,* 9 Cush. 177. The only reasonable interpretation of which this covenant is susceptible is, that the lessee thereby agrees to pay such part of the entire tax assessed on the whole estate as the portion thereof demised by the lease bears to the entire premises. The precise sum could not be fixed in the lease, because it would necessarily be uncertain, and might vary from year to year. Nor could the mode of apportionment be well made to depend on the act of the assessors of the city. They were official persons, bound to perform a certain duty, but they were not obliged to regard the special agreements of individuals as to the mode of assessing or apportioning taxes on their property. The plaintiffs had no power to compel a separate assessment of different parts of the same estate belonging to them. It would be little less than absurd to say, in the absence of any express stipulation to that effect, that the liability of the lessee, on his covenant for payment of the taxes assessed on the premises, was to depend on a voluntary act of the assessors, which they were not bound to perform, and which the lessors had no right to ask of them. The taxes were legally assessed on the whole estate to the owner, and the liability of the lessee under

23 *

his covenant to pay his proportion was thereby fixed. The mode of ascertaining the amount of this liability was not provided for in the lease, but was left to be adjusted between the parties.

6. The next point involves a question of more difficulty and importance. The plaintiffs claim to recover on the covenant in the lease, by which the lessee stipulates that he will not make or suffer any waste upon the premises during the term, and to prove a breach they rely mainly upon the removal therefrom of the gas and water pipes, which were put into the building by tenants thereof holding the same as assignees of the lessee. The defendant, on the other hand, contends that these articles having been placed on the premises by the tenants, did not belong to the plaintiffs, and that their removal does not constitute waste for which this action can be maintained against him. This raises the question, whether, under the circumstances proved in this case, the pipes annexed to the building for the purpose of conducting water and gas into the various rooms, can be regarded as " tenant's fixtures," which term, in its strict legal definition, is to be understood to signify things which are fixed to the freehold of the demised premises, but which nevertheless the tenant is allowed to disannex and take away, provided he seasonably exert his right to do so. The cases on this subject are very numerous, and many of them, being from their nature decided on the facts peculiar to each case, do not afford much light upon the general principles which courts of justice have adopted in settling the mutual rights of lessor and lessee to property of this nature.

Certain rules, however, may be taken as well settled by the uniform current of judicial decisions. The first and leading one is, that the law regards with peculiar favor the rights of tenants, as against their landlords, to remove articles annexed by them to the freehold, and extends much greater indulgence to them in this respect than it concedes to executors, remaindermen or any other class of persons. *Elwes* v. *Maw*, 3 East, 38. *Grymes* v. *Boweren*, 6 Bing. 439. *Elliott* v. *Bishop*, 10 Exch. 507. Smith Landl. & Ten. 264. The reason for this is, that

tenants usually pay to their landlords adequate rent, and it is therefore equitable that they should have the right to remove fixtures which have been put up by them for their own convenience and use, and at their own expense.

Another well settled rule is that fixtures, which a tenant is allowed to disannex and take away, are comprehended within two classes, or are of a mixed nature, falling partly within and partaking of the nature of both. These classes are, first, those which are put up for ornament or the more convenient use of the premises, and are called domestic fixtures; second, those which are put up for the purposes of trade, and are known as trade fixtures. Gibbons on Fixtures, 22, 32. Smith Landl. & Ten. 264. Amos & Ferard on Fixtures, Pt. 1, *c.* 2, §§ 1, 3, 4. In order to determine, whether in any particular case chattels annexed to the freehold come within these classes, so that the tenant has the right to remove them, several considerations are to be regarded. One of the chief of these is the mode of their annexation to the building; that is, whether they are annexed to the fabric of the house, and the extent to which they are so united, and whether they can be taken down and removed *integre, salve et commode,* without substantial injury to the building or to themselves. Another important consideration is the intention with which they were annexed by the tenant, and the purposes which they were designed to answer; that is, whether they were intended for a permanent and substantial improvement to the realty, *perpetui usus causa,* or, as it is sometimes said, *pour un profit del inheritance;* or whether they were put up and used for a temporary object, or for the more convenient occupation and enjoyment of the premises for the particular purpose for which the tenant used them, so that they were useful and necessary rather to the comfortable and convenient occupation of the building than to the building itself. Amos & Ferard on Fixtures, Pt. 1, *c.* 2, § 1. Smith Landl. & Ten. 270, *note. Buck land* v. *Butterfield,* 2 Brod. & Bing. 54. *Hellawell* v. *Eastwood,* 6 Exch. 295.

The application of these rules and principles to the case at bar is decisive of the nature and character of the articles which

were removed from the demised premises by the tenants. They were but slightly annexed to the building, and were removed without any substantial damage to the building, and without essential injury to themselves. The premises were intended for and demised as a tavern and boarding-house. The articles were themselves of a mixed nature, and may well be regarded as combining the qualities of both domestic and trade fixtures. They were designed by the tenants to be used in carrying on the business for which the premises were occupied, and they were also adopted for the more easy and comfortable use and enjoyment of the building. They were useful and convenient, rather than essential and permanent additions to the premises. At the time of the demise, the house was supplied with water and furnished with light by other means. The pipes were not necessary therefore to the complete enjoyment of the premises. They were only added to subserve the domestic purposes to which they were applied, and to render the premises more suitable for the particular use to which they were appropriated.

It would be quite useless to multiply authorities or seek out analogies, in support of the view we have taken of this part of the case. We must be governed in questions of this nature very much by the circumstances of each case. But it may not be inappropriate to refer to the case of *Grymes* v. *Boweren,* 6 Bing. 437, in which it was held that a tenant might remove a pump which was attached to a perpendicular plank resting on the ground at one end and at the other end fastened to the wall by an iron pin, which had a head at one end and a screw at the other, and which went entirely through the wall. If this was not a part of the realty, it can hardly be contended that water pipes, slightly affixed to the ceiling, and passing through holes in the floors, are so far fixed, that they cannot be removed by the tenant, but belong to the owner of the premises. So too in a recent case, already cited, Mr. Baron Platt said : " If a landlord demised a house with grates or gas fittings at an entire rent, they would belong to him at the expiration of the term. But if he had let the house unfurnished with these conveniences, and the tenant, for the enjoyment of his occupation, fixes them

in the house, the tenant, unless he had contracted to leave them behind, might undoubtedly remove them during the term." *Elliott* v. *Bishop*, 10 Exch. 512.

Upon the facts proved in this case, we are therefore of opinion that the plaintiffs fail to prove any breach of the covenant against waste. For the unavoidable injury resulting to the premises from the removal of the fixtures, the plaintiffs may perhaps have a remedy either against the defendant or those who severed the fixtures from the building. See Amos & Ferard on Fixtures, (2d Amer. ed.) 89. But it is clear that it cannot be enforced in this action.

7. In regard to the removal of the tiles, it is sufficient to say that the rights and remedies of the parties must depend on the special agreement entered into between them, subsequently to the date of the lease, by which liberty to put down the tiles was expressly given to the lessee, and stipulations were made concerning the right of the tenants to take them away, and the landlord to purchase them, upon certain terms therein specified. When there is a special agreement between landlord and tenant regarding fixtures, that overrules and supersedes the general rules of law regulating their mutual rights and obligations. *Naylor* v. *Collinge*, 1 Taunt. 19. *Thresher* v. *East London Water Works*, 2 B. & C. 608, and 4 D. & R. 62. Amos & Ferard on Fixtures, 108, 109. The plaintiffs must seek their remedy on this special agreement, if the removal of the tiles was a violation of its stipulations. *Judgment for the plaintiffs.*